UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| CARMEN FLORES, as administrator of ESTATE OF DWAYNE JOEL FLORES, DECEASED, AND CARMEN FLORES in her own right,<br><br>Plaintiffs,<br><br>v.<br><br>CAMDEN COUNTY DEPARTMENT OF CORRECTIONS, *et al.*,<br><br>Defendants. | Case No. 21–cv–09120–ESK–AMD<br><br>OPINION |

**KIEL, U.S.D.J.**

**THIS MATTER** comes before the Court on defendants Camden County Department of Corrections (Department), Camden County Juvenile Detention Center (Center) (collectively the municipal defendants), David S. Owens, Jr., Karen Taylor, Loretta Nichols, Christopher Foschini, Jacquelyne Wescott, John Jones, Tiffany DeAngelis, John Kamulda, Helen Stillman, Damien Velez, Joseph Carney, and Carvin Bailey's (collectively the individual defendants) motion for summary judgment (Motion) (ECF No. 116.)  Plaintiffs Carmen Flores, in her role as the administrator of Dwayne Joel Flores's[1] estate and in her own right, opposes the Motion.  (ECF No. 124.)  For the following reasons, I will grant the Motion as to the federal claims and dismiss the state law claims for lack of subject matter jurisdiction.

---

[1] Throughout this opinion I will refer to the deceased as Dwayne to distinguish him from his mother, plaintiff Carmen Flores, who I will refer to as Flores when speaking about her in her personal capacity.

I.  FACTS AND PROCEDURAL HISTORY

A.  <u>Undisputed Facts</u>[2]

The Department is responsible for housing incarcerated persons and pretrial detainees in Camden County. (ECF No. 116–2 ¶ 1.) Pretrial juvenile detainees are housed in the Center, which is overseen by the Department. (*Id.* ¶¶ 6, 8.) Defendant Owens served as the Department and Center Director at the relevant times. (*Id.* ¶ 2.) Defendant Taylor was the Department warden at the relevant times. (*Id.* ¶ 4.) The Center consists of eight housing units with a separate Behavioral Management Unit (Unit). (*Id.* ¶ 9.) Juvenile Detention Officer (Officer) staff are assigned to one of two divisions, and each division has two shifts: 7:00 a.m. to 7:00 p.m. and 7:00 p.m. to 7:00 a.m (*Id.* ¶¶ 10, 11.)

On February 3, 2019, Dwayne was remanded to the Center after being charged with various criminal charges. (*Id.* ¶ 35.) He was 15 at the time and had been sent to the Center multiple times since September 2017. (*Id.* ¶¶ 32, 36.) Officers strip-searched Dwayne upon his arrival to the center and did not discover any contraband. (*Id.* ¶¶ 37, 38.) On April 10, 2019, Dwayne was placed in the Unit. (*Id.* ¶ 39.) Unit residents are assigned to the Unit "only when their continued housing in general population would pose a threat to others, or may cause serious damage to property." (*Id.* ¶ 42 (internal quotation marks omitted).) "The [Unit] is comprised of six rooms situated against a wall opposite the entrance to the [Unit]." (*Id.* ¶ 44.) An Officer sits in the middle of the Unit facing the rooms. (*Id.* ¶ 45.) Dwayne was assigned to room six, which "is the room furthest to the right from the [Officer's] perspective." (*Id.*

---

[2] Plaintiffs respond to certain statements of fact by saying they "agree[] with the facts set forth in the corresponding paragraph and/or [are] currently without information, knowledge or belief which would dispute such facts as stated." (*See, e.g.*, ECF No. 124 p. 3.) I consider these facts to be undisputed for purposes of the Motion. Fed. R. Civ. P. 56(e)(2).

¶ 48.)   Unit residents are supervised by Officers 24 hours per day, and Officers are required to visually check each Unit resident every 15 minutes.   (*Id.* ¶¶ 43, 49.)   The checks are required to be documented in a logbook and may be carried out "on an 'irregular basis' to ensure residents cannot discern any pattern of staff observation."   (*Id.* ¶¶ 50, 51.)

Dwayne completed the required Mental Health Risk Assessment Questionnaire (Questionnaire) when he was admitted to the Center.   (*Id.* ¶ 55.)   He answered "yes" to the question asking if he took "prescription medication in the past to treat anxiety, depression, and/or other mental health ailments."   (*Id.* ¶ 56.)   Center policy requires Center staff "to place residents on suicide watch 'immediately' if any of the initial questions on the [Questionnaire] are answered positively … ."   (*Id.* ¶ 57.)   Since Dwyane had answered "yes" to one of the screening questions, he was placed on suicide watch in the Unit.   (*Id.* ¶¶ 52, 57.)

Policy also requires staff to continuously observe residents on suicide watch "to varying degrees … depending on their behavior or circumstances." (*Id.* ¶¶ 58, 59.)   These checks are also supposed to be documented in the logbook. (*Id.* ¶ 61.)   "At all relevant times, [Dwayne] was subject to observation every five minutes." (*Id.* ¶ 60.)   Dwayne completed seven Questionnaires between his first assignment to the Center in 2017 and April 2019; he "never exhibited, nor expressed, any suicidal ideations, tendencies, or thoughts."   (*Id.* ¶¶ 62, 63.)   A January 12, 2018 psychiatric evaluation "notes that [Dwayne] never attempted suicide and never possessed any suicidal or homicidal ideations."   (*Id.* ¶ 64.)   "A medical assessment dated that same day also indicates [Dwayne] never attempted or considered suicide and did not want to hurt anyone."   (*Id.* ¶ 65.)

Flores confirmed that Dwayne had never attempted suicide and "was almost always happy, and constantly making jokes."   (*Id.* ¶¶ 66, 68.)   She did

3

not know if Dwayne was depressed. (*Id.* ¶ 69.) She confirmed that Dwayne did not have a history of drug use. (*Id.* ¶ 70.) Neither the Officer staff nor the medical personnel knew Dwayne "to have a history of drug use, other than cannabis." (*Id.* ¶ 71.)

Officer Gregory Frazier was on duty in the Unit from 7:00 a.m. to 7:00 p.m. on April 13, 2019. (*Id.* ¶ 73.) There were four residents in the Unit including Dwayne. (*Id.* ¶ 74.) Nurse Lisa MacCrea provided Dwayne with his evening medication at 5:30 p.m. and administered Benadryl when Dwayne told her that he was "feeling itchy … ." (*Id.* ¶¶ 75, 76.) She did not notice anything out of the ordinary when she spoke with Dwayne. (*Id.* ¶ 77.) Officer Helen Stillman replaced Frazier at 6:50 p.m. to begin her 7:00 p.m. to 7:00 a.m. shift. (*Id.* ¶¶ 78, 79.) She spoke with Frazier after conducting headcounts "so that he could apprise her of anything she needed to know going into her overnight shift." (*Id.* ¶ 80.) She knew that Dwayne was on suicide watch but did not know why. (*Id.* ¶ 81.)

Unit showers were delayed while Stillman disinfected one of the rooms, and Dwayne showered last. (*Id.* ¶¶ 82, 83.) Stillman searched Dwayne's room while he was in the shower and did not find any contraband. (*Id.* ¶ 85.) Stillman could hear Dwayne in the shower "'singing, carrying on, cursing like [Dwayne] always does, cursing' during his shower." (*Id.* ¶ 84.) Dwayne ate a snack before turning in for bed at 8:15 p.m. (*Id.* ¶ 86.) Stillman noted that Dwayne "'seemed fine'" and continued to monitor the residents every five minutes. (*Id.* ¶ 87.) Stillman stated the Unit "was completely silent during her shift, and that she could hear everything," including Dwayne sleep-talking. (*Id.* ¶¶ 88, 89.) She did not witness anything "abnormal" during her shift and "ensured that she was checking all six rooms in the [Unit] every five minutes, 'like it was a routine for me.'" (*Id.* ¶¶ 90, 91.) Knowing that some Unit residents, including Dwyane, were heavy sleepers, Stillman "typically looked

4

for residents' movements" during her checks.  (*Id.* ¶¶ 92, 93.)  She stated that she had an unobstructed view of Dwyane and could see his chest moving throughout the night.  (*Id.* ¶¶ 94, 95.)  She was unaware of any health issues Dwayne may have had.  (*Id.* ¶ 96.)

Officer Damien Velez relieved Stillman from her post at approximately 6:55 a.m. on April 14, 2019, at which time he conducted his preliminary room checks and other duties.  (*Id.* ¶¶ 99, 100.)  He later stated that he brought the Unit residents out one-by-one and called Dwyane's name around 9:30 a.m.  (*Id.* ¶¶ 102, 103.)  There was no response, so Velez entered Dwyane's cell to wake him up.  (*Id.* ¶ 104.)  Velez attempted to wake Dwyane by shaking his leg, "but immediately felt the stiffness in [Dwyane's] body."  (*Id.* ¶ 105.)  Velez immediately radioed for assistance.  (*Id.* ¶ 106.)  MacCrea, who had been at intake at the time, ran to Dwayne's room and "began shaking and calling [Dwayne's] name in an attempt to get him to respond."  (*Id.* ¶¶ 107, 108, 109.)  She was unable to find Dwyane's pulse and noted that he was "'ice cold' and 'very stiff.'"  (*Id.* ¶ 110.)  Velez was asked to leave the room, and he went into the courtyard to take a brief walk and clear his head.  (*Id.* ¶¶ 111, 112.)

Department Captain Neal Chapman also responded to Dwyane's room after Velez's radio call.  (*Id.* ¶ 113.)  He notified Captain Loretta Nichols, who in turn notified Deputy Warden Christopher Foschini.  (*Id.* ¶¶ 113, 114.)  Sergeant Joseph Carney called 911 for medical assistance at approximately 9:35 a.m.  (*Id.* ¶ 115.)  MacCrea attempted to perform CPR on Dwayne until paramedics arrived and took over.  (*Id.* ¶¶ 116, 117.)  The "[p]aramedics applied an Automated External Defibrillator and no shock was advised."  (*Id.* ¶ 118.)  They did not perform additional CPR.  (*Id.* ¶ 119.)  Dwyane was pronounced deceased at approximately 10:03 a.m.  (*Id.* ¶ 120.)  His autopsy report "confirmed that he died of 'Amphetamine and Heroin Intoxication.'"  (*Id.* ¶ 123.)  His death was ruled an accident.  (*Id.* ¶ 124.)

Major Crimes Detectives from the Camden County Prosecutor's Office reported to the Unit for an investigation. (*Id.* ¶ 121.) K-9 units searched the Center but did not find any controlled dangerous substances. (*Id.* ¶ 125.) The Department's Internal Affairs Unit and the Prosecutor's Office investigated and processed the scene and interviewed certain people. (*Id.* ¶¶ 126, 127.) The Attorney General's Office and New Jersey State Police advised that they would be investigating and issued a letter staying the Department's internal review. (*Id.* ¶¶ 128, 129.) The Attorney General's Office investigated and presented its findings to a grand jury, but the grand jury declined to charge Stillman and Velez. (*Id.* ¶¶ 131, 132, 133, 134.)

An expert later "opined that even if Officer Stillman and Officer Velez had checked [Dwayne] every minute, rather than every five minutes, [Dwayne] would have had ample opportunity to ingest the narcotics that ultimately killed him." (*Id.* ¶ 135.)

### B. Procedural History

Plaintiffs filed the Complaint on April 13, 2021. (ECF No. 1.) Plaintiffs assert defendants violated Dwyane's Fourteenth Amendment due process right by ignoring his vulnerability to suicide (Count I) (Compl. pp. 14, 15); were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment (Count II) (*id.* pp. 15, 16); negligently failed to keep controlled dangerous substances out of the Center in violation of the New Jersey Tort Claims Act (Tort Claims Act) (Count III) (*id.* pp.17, 18, 19). Plaintiffs also bring wrongful death and survivorship claims under state law. (*Id.* pp. 22, 23.)[3]

---

[3] Count IV alleged the medical defendants, namely MacCrea and her employer CFG Health Systems, were negligent in treating Dwayne's serious medical needs. (Compl. pp. 19, 20, 21.) Plaintiffs stipulated to dismissing MacCrea and CFG with prejudice on April 19, 2024. (ECF No. 110.)

Defendants move for summary judgment on plaintiffs' claims, arguing that plaintiffs have not satisfied their burden of proof. (ECF No. 116–1 pp. 2, 3.) Defendants also argue they are entitled to qualified immunity. (*Id.* pp. 29, 20.)

## II. LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material if it "might affect the outcome of the suit under the governing law" and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party has the initial burden of showing the basis for its motion and that there is no genuine dispute of material fact. *See Celotex Corp.*, 477 U.S. at 323. The moving party must cite specific materials in the record. Fed. R. Civ. P. 56(c)(1)(A). "[T]he burden on the moving party may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the moving party has satisfied its burden, the non-moving party, "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson*, 477 U.S. at 257. "While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla." *Hugh v. Butler Cnty. Fam. YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Anderson*, 477 U.S. at 251).

### III. DISCUSSION

#### A. <u>Vulnerability to Suicide</u>

Defendants argue that they are entitled to summary judgment on Count I, plaintiffs' claim that defendants deprived Dwyane of his due process right to be protected from his vulnerability to suicide. (ECF No. 116–1 p. 13.) "[T]he vulnerability to suicide framework is simply a more specific application of the general rule … which requires that prison officials not be deliberately indifferent to the serious medical needs of prisoners." *Palakovic v. Wetzel*, 854 F.3d 209, 222 (3d Cir. 2017) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *see also Woloszyn v. Cnty. of Lawrence*, 396 F.3d 314, 320 (3d Cir. 2005) ("A particular vulnerability to suicide represents a serious medical need."). To hold defendants liable for failure to prevent Dwyane's suicide, plaintiffs must establish that: (1) Dwyane had a "particular vulnerability to suicide, meaning that there was a strong likelihood, rather than a mere possibility, that a suicide would be attempted;" (2) the defendants "knew or should have known" of that vulnerability; and (3) those defendants "acted with reckless or deliberate indifference" to Dwyane's particular vulnerability. *Palakovic*, 854 F.3d at 223–24 (cleaned up).

After considering the record and the parties' arguments, I find that defendants have shown that plaintiffs cannot establish that they were deliberately indifferent to Dwyane's vulnerability to suicide. As an initial matter, there is no evidence that Dwyane died by suicide. The autopsy report lists Dwyane's manner of death as an "accident." (ECF No. 116–2 ¶ 124.) Plaintiffs allege in the Complaint that the manner of death was originally ruled a suicide but later changed to an accident. (Compl. ¶ 39.) However, plaintiffs have not presented any evidence to support this claim, and they "may not rest upon the mere allegations or denials of [their] pleadings but, instead, must set forth specific facts showing that there is a genuine issue for trial. Bare

assertions, conclusory allegations, or suspicions will not suffice." *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288–89 (3d Cir. 2018) (internal quotation marks omitted). Regardless, I find that there is no genuine dispute of material fact even if Dwayne did commit suicide because plaintiffs have not shown that Dwyane had a particular vulnerability to suicide or that defendants were deliberately indifferent to that vulnerability.

"A particular vulnerability to suicide 'speaks to the degree of risk inherent in the detainee's condition.'" *Est. of Borroto v. CFG Health Sys., LLC*, ___ F. Supp. 3d ___, 2024 WL 4318600, at *18–19 (D.N.J. Sept. 27, 2024) (quoting *Woloszyn*, 396 F.3d at 320). "[T]here must be a strong likelihood, rather than a mere possibility, that self-inflicted harm will occur." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1024 (3d Cir. 1991) (internal quotation marks omitted). Here, the evidence does not show that there was a strong likelihood that Dwayne would harm himself. Flores testified that, to her knowledge, Dwyane never attempted suicide. (ECF No. 116–4 p. 36.) She further testified that she had no knowledge that Dwayne was depressed and insisted that he would have talked to her if he had a problem. (*Id.* p. 45.) Dwyane's January 12, 2018 psychiatric evaluation, supports Flores's testimony, noting that Dwyane "never attempted suicide and never possessed any suicidal … ideations." (ECF No. 116–2 ¶ 64.) "A medical assessment dated that same day also indicates [Dwayne] never attempted or considered suicide … ." (*Id.* ¶ 65.) Accordingly, there is no evidence in the undisputed record from which a reasonable factfinder could conclude that Dwyane had a particular vulnerability to suicide.

A reasonable factfinder also could not conclude that defendants were deliberately indifferent. Dwyane denied on each of the seven Center Questionnaires that he completed between July 2017 and February 2019 that he had "any suicidal ideations, tendencies, or thoughts." (*Id.* ¶¶ 62, 63.) Dwayne's placement on suicide watch does not indicate a particular

9

vulnerability to suicide. The record shows that he was put onto suicide watch because he stated on his Questionnaire that he had taken prescription medication "to treat anxiety, depression, and/or other mental health ailments" in the past, which required Center staff to put him on suicide watch. (*Id.* ¶¶ 56, 57.) MacCrea and Stillman both testified that they did not notice anything out of the ordinary when they interacted with Dwyane on April 13. (*Id.* ¶¶ 77, 84, 87.)

In short, plaintiffs have not provided any evidence that defendants were aware that Dwyane was predisposed towards suicide but recklessly or deliberately ignored that risk. "[T]here can be no reckless or deliberate indifference to [the risk of suicide] unless there is something more culpable on the part of the officials than a negligent failure to recognize the high risk of suicide." *Colburn*, 946 F.2d at 1025. In the absence of such evidence, I find that defendants are entitled to judgment as a matter of law on Count I.

### B. <u>Denial of Medial Care</u>

Count II alleges defendants were deliberately indifferent to Dwyane's serious need for adequate mental healthcare and that this indifference, including placing Dwayne in the solitary confinement of the Unit, led to injury in the form of deterioration of Dwyane's condition ultimately leading to his suicide. (Compl. ¶¶ 50,51.) Claims by pretrial detainees for failing to provide adequate medical care arise under the Fourteenth Amendment Due Process Clause and are analyzed "under the standard used to evaluate similar claims brought under the Eighth Amendment[.]" *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003). I will therefore use the Eighth Amendment standard. *See Moore v. Luffey*, 767 F. App'x 335, 340 (3d Cir. 2019).

"[P]rison officials violate the Eighth Amendment when they act deliberately indifferent to a prisoner's serious medical needs by 'intentionally

denying or delaying access to medical care or interfering with the treatment once prescribed.'" *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). To succeed on their claim, plaintiffs "must make (1) a subjective showing that 'the defendants were deliberately indifferent to [Dwyane's] medical needs' and (2) an objective showing that 'those needs were serious.'" *Id.* (quoting *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999)).

"A medical need is serious if it 'has been diagnosed by a physician as requiring treatment,' or if it 'is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Mitchell v. Beard*, 492 F. App'x 230, 236 (3d Cir. 2012) (quoting *Atkinson v. Taylor*, 316 F.3d 257, 272–73 (3d Cir. 2003)). The record before me indicates that Dwyane was prescribed Zoloft for depression and Vyvanse for Attention Deficit Hyperactivity Disorder (ADHD).[4] (ECF No. 116–4 p.142). Therefore, I conclude that plaintiffs have shown that Dwayne had a serious medical need.

Proving the existence of a serious medical need is not enough to establish a claim under either the Fourteenth or Eighth Amendment, however. Plaintiffs must also prove that defendants were deliberately indifferent to Dwyane's needs. "Allegations of medical malpractice are not sufficient to establish a Constitutional violation, nor is mere disagreement as to the proper medical treatment." *Parkell v. Danberg*, 833 F.3d 313, 337 (3d Cir. 2016) (cleaned up). "A failure to provide adequate care that was deliberate, and motivated by non-medical factors is actionable under the Eighth Amendment, but inadequate care that was a result of an error in medical judgment is not."

---

[4] I note that Dwyane answered "no" when asked if he was currently taking medication for mental health reasons in his February 2019 Questionnaire. (ECF No. 128–3 p. 2.) This discrepancy is not a dispute of material fact because plaintiffs have not provided evidence of deliberate indifference even after assuming that Dwyane was taking Zoloft and Vyvanse at the time of his death.

11

*Id.* (cleaned up). The Third Circuit has found deliberate indifference "'where the prison official (1) knows of a prisoner's need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or recommended medical treatment.'" *Id.* (quoting *Rouse*, 182 F.3d at 197).

The individual defendants have submitted evidence that they were not deliberately indifferent to Dwyane's medical needs.[5] The individual defendants are not medical professionals, and "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official … will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004). Here, Center medical staff evaluated Dwayne upon his admission to the Center on February 3, 2019. (ECF No. 116–4 pp. 157, 159). He denied using any drugs besides marijuana and alcohol. (*Id.* p. 158.) After completing the admission forms, the behavior health nurse practitioner made the decision to put Dwyane on suicide watch because he had put on the Questionnaire that he took "prescription medication in the past to treat anxiety, depression, and/or other mental health ailments." (*Id.* p. 162; ECF No. 116–2 ¶¶ 52, 56.) MacCrea gave Dwyane his prescribed medications the morning of April 13, 2019 and did not notice anything unusual about his behavior. (ECF No. 116–4 p. 179.) Lieutenant Kamulda, who conducted the Department's internal investigation, testified that there was no indication that Dwyane had ever sought mental health services and was denied care. (*Id.* p. 125.)

In response, plaintiffs have not presented any evidence that suggests the individual defendants had any reason to know that Center medical personnel

---

[5] I discuss the municipal defendants' liability *infra*.

12

were mistreating or failing to treat Dwyane's mental health needs. Nor have plaintiffs presented evidence that the individual defendants put Dwyane into solitary confinement knowing that the Unit conditions were unnecessarily harmful or inhumane. Therefore, plaintiffs cannot satisfy their burden of proof on the deliberate indifference element of their claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). I find that there is no genuine dispute of material fact and that the individual defendants are entitled to summary judgment on Count II.[6]

### C. *Monell* Liability

Likewise, plaintiffs have not shown that the municipal defendants were deliberately indifferent to Dwayne's medical needs. "A municipality cannot be held liable for the unconstitutional acts of its employees on a theory of *respondeat superior*. A plaintiff seeking to hold a municipality liable under section 1983 must demonstrate that the violation of rights was caused by the municipality's policy or custom." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978)). "A successful *Monell* claim must therefore establish: (1) an underlying constitutional violation; (2) a policy or custom attributable to the municipality; and (3) that the constitutional violation was caused by the municipality's policy or custom." *Hargrove v. City of Philadelphia*, 671 F. Supp. 3d 595, 605 (E.D. Pa. 2023). "The municipality is liable when either the policy or custom facially violates the Constitution, or if not unconstitutional itself, is the 'moving force' behind the constitutional violation." *Id.* (citing *Monell*, 463 U.S. at 694).

---

[6] As summary judgment will be granted in favor of the individual defendants, it is unnecessary to address their qualified immunity argument beyond noting that the evidence viewed in the light most favorable to plaintiffs does not show that defendants violated a federal statutory or constitutional right.

13

As discussed *supra*, plaintiffs have not established that there was an underlying constitutional violation. Therefore, they cannot maintain a municipal liability claim. *Startzell v. City of Philadelphia, Pennsylvania*, 533 F.3d 183, 204 (3d Cir. 2008); *see also Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 482 (3d Cir.2003) ("[F]or there to be municipal liability, there still must be a violation of the plaintiff's constitutional rights.") Therefore, I find that the municipal defendants are also entitled to judgment as a matter of law on Count II.

### D. Doe Defendants

I will also dismiss Counts I and II against the still unnamed Doe defendants. (Compl. ¶¶ 22, 23.) Fact discovery closed February 7, 2024. (ECF No. 105 ¶ 2.) Despite the close of discovery, plaintiffs have failed to identify these unnamed defendants. Because plaintiffs have failed to identify the Doe defendants and because the time for doing so has since past, I must dismiss the Doe defendants pursuant to Federal Rule of Civil Procedure 21, which allows a court to "on motion or on its own, … at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21; *see also Blakeslee v. Clinton County*, 336 F. App'x 248, 250 (3d Cir. 2009) (affirming dismissal of Doe defendants pursuant to Rule 21). "Use of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified. If reasonable discovery does not unveil the proper identities, however, the John Doe defendants must be dismissed." *Id.* Plaintiffs have had more than enough time to identify the individual unnamed defendants and thereafter to amend the Complaint, but they have failed to do so.

### E. State Law Claims

Having dismissed all claims over which the Court had federal question jurisdiction, 28 U.S.C. § 1331, I must now determine whether to continue to exercise supplemental jurisdiction over the remaining state law claims for

14

negligence, wrongful death, and survivorship. 28 U.S.C. § 1367. The Third Circuit "has recognized that 'where the claim over which the district court has original jurisdiction is dismissed before trial, the district court *must* decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so.'" *Hedges v. Musco*, 204 F.3d 109, 123 (3rd Cir. 2000) (emphasis in original) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)); *see also Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994) ("It is axiomatic that when all federal claims are eliminated prior to trial, a court should decline to exercise jurisdiction over any remaining pendent state claims." (internal quotation marks omitted)).

Defendants assert I should continue to exercise supplemental jurisdiction due to the age of the case and the fact that "the parties have engaged in dozens of case management conferences, thus the Court is familiar with this matter." (ECF No. 116–1 p. 31.) Although it is true that the Complaint was filed here in 2021, I have only been assigned to the case since March 25, 2024. (ECF No. 106.) The parties will not be deprived of a judge that is extensively familiar with the proceedings if I decline to exercise supplemental jurisdiction.

The age of the case may present a compelling reason to exercise jurisdiction due to the presumed expiration of the statute of limitations, but "Congress foresaw the precise problem … and prescribed a cure." *Hedges*, 204 F.3d at 123. Section 1367(d)(3) "suspends the statute of limitations for two adjacent time periods: while the claim is pending in federal court and for 30 days postdismissal." *Artis v. D.C.*, 583 U.S. 71, 83 (2018). If I decline to exercise supplemental jurisdiction, plaintiffs will have whatever time remained in the statute of limitations before they filed the Complaint plus the 30-day grace period to refile in state court, unless state law provides for a longer amount of time. *Id.* at 83–34. This will sufficiently protect plaintiffs' rights.

15

In contrast, I find that there is a compelling reason to decline to exercise supplemental jurisdiction, namely New Jersey's interest in adjudicating matters related to the alleged negligence of public officials in juvenile correctional settings. Defendants are public entities and employees charged with overseeing the health and safety of juveniles detained by Camden County, and the New Jersey courts and citizens have a strong interest in scrutinizing defendants' alleged conduct. *Cf. United States v. Smith*, 776 F.2d 1104, 1114 (3d Cir. 1985) ("[T]he public has a substantial interest in the integrity or lack of integrity of those who serve them in public office.").

In sum, I find that there are no considerations that would require the Court to retain supplemental jurisdiction over the state law claims whereas there is a significant reason to permit the state courts to address the state law claims. Therefore, I will dismiss the remaining state law claims for lack of subject matter jurisdiction.

### IV. CONCLUSION

Summary judgment is granted in favor of defendants as to Counts I and II of the Complaint. Because only state law claims remain, this case is dismissed for lack of subject matter jurisdiction with leave to reinstate the claims in the appropriate state court within 30 days of the entry of this order unless state law provides for a longer tolling period. *See* 28 U.S.C. § 1367(d)(3). An appropriate Order accompanies this Opinion.

*/s/ Edward S. Kiel*
**EDWARD S. KIEL**
UNITED STATES DISTRICT JUDGE

Dated: January 6, 2025